

**FILED**

Feb 25 2015, 9:37 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Jennifer A. Joas
Joas & Stotts
Madison, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Abigail R. Miller
Deputy Attorneys General
Indianapolis, Indiana

# I N  T H E
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of:<br>E.W. (Minor Child), Child in<br>Need of Services | February 25, 2015 |
| | Court of Appeals Case No.<br>40A04-1407-JC-349 |
| J.W. (Mother), | |
| *Appellant-Respondent,* | Appeal from the Jennings Circuit<br>Court. |
| v. | The Honorable Jon W. Webster,<br>Judge. |
| | Cause No. 40C01-0908-JC-244 |
| The Indiana Department of<br>Child Services, | |
| *Appellee-Petitioner* | |

**Baker, Judge.**

[1] J.W. (Mother) appeals the juvenile court's order terminating visits and phone contact with her child, E.W. (Child). Mother argues that there is insufficient evidence supporting the juvenile court's order. Finding sufficient evidence, we affirm.

## Facts

[2] On August 18, 2009, DCS filed a petition alleging that Child was a Child in Need of Services (CHINS). The petition alleged that then ten-year-old Child was having sex with her boyfriend and that Mother had frequently "checked" Child's "privates" to see if she was engaging in sexual intercourse. Appellant's App. p. 21. Eventually, both Mother and Child's father admitted that Child was a CHINS.

[3] Initially, Child remained in Mother's care. Child was removed from Mother's care and placed in the Columbus Behavioral Facility between June and October 2010. Upon being released from the facility, Child returned to Mother's care. Child was again removed from Mother's care and placed in a facility and in foster care between January and April 2011 because Mother's home failed to meet minimal standards and Mother was not following Child's medication regimen.

[4] Child was returned to Mother's care in April 2011 but was again removed in June 2011. Child was removed on this occasion because Mother failed to adequately supervise Child and because Child had been raped. A medical

examination confirmed that Child had tearing, bruising, and blood in her vaginal area. Child has not been returned to Mother's care since June 2011.

[5] Mother and Child had supervised visits after the June 2011 removal. The visitation supervisor reported that about half of these visits were detrimental to Child because of Mother's inappropriate comments and behaviors. For example, Mother made inappropriate sexual comments. At one point, Mother asked the Family Case Manager (FCM) about providing sex toys to Child. Child reported that at one visit, Mother had grabbed her breast to see if she was sexually active. The visitation supervisor further testified that he had seen no improvement in Mother's parenting skills in the ten months he had supervised the visits. Mother testified that she did not "see anything wrong really with what [she is] doing." Tr. p. 74. Mother has been unwilling to participate in court-ordered services that are designed to improve her parenting skills and her mental health.

[6] Mother undermined Child's foster parents in multiple ways. On one occasion, Child accepted the sexual advances of a boy and then bragged about it at school. Her foster father required her to write 500 sentences as a consequence and told her she was not allowed to have a relationship with the boy. Mother told the foster father in Child's presence that she disagreed and would give Child more freedom. On another visit, Mother took Child to look at cell phones. Child called her foster father to see if she could get one, and he said no. Mother told Child that if she were in her care, she would give her whatever

she wanted. Child reported that Mother acts like a teenager and is not willing to make changes to be an appropriate parent.

[7] Child's therapist identified Mother's presence in Child's life as a stressor. Mother's visits affect Child negatively, and Mother frequently makes inappropriate comments that are upsetting to Child. The therapist also stated that some of Child's current mental health issues are directly related to her visits with Mother. Child's therapist recommended that all visits and phone contact with Mother should stop because of the detrimental effects on Child's mental health and well-being. The FCM and Child's court appointed special advocate (CASA) agreed with that recommendation.

[8] On September 26, 2013, the juvenile court changed Child's permanency plan to "another planned permanent living arrangement" (APPLA). On February 19, 2014, the juvenile court approved DCS's recommendation that all visits between Mother and Child cease, and on May 19, 2014, the juvenile court clarified that all visitation between Mother and Child ceased as of February 19 and that Child's permanency plan was APPLA. Mother now appeals.

## Discussion and Decision

## I. Jurisdiction

[9] Initially, we must address jurisdiction. DCS has not argued that we are without jurisdiction to consider this appeal, but we believe that the issue must be addressed. Mother has brought this appeal under Indiana Appellate Rule 5(A)

as an appeal from a final judgment. Appellate Rule 2(H) explains that a judgment is a final judgment if:

(1)      it disposes of all claims as to all parties;

(2)      the trial court in writing expressly determines under Trial Rule 54(B) or Trial Rule 56(C) that there is no just reason for delay and in writing expressly directs the entry of judgment (i) under Trial Rule 54(B) as to fewer than all the claims or parties, or (ii) under Trial Rule 56(C) as to fewer than all the issues, claims or parties;

(3)      it is deemed final under Trial Rule 60(C);

(4)      it is a ruling on either a mandatory or permissive Motion to Correct Error which was timely filed under Trial Rule 59 or Criminal Rule 16; or

(5)      it is otherwise deemed final by law.

At first glance, it seems that none of these considerations apply to the trial court's May 18, 2014, order. The CHINS case is still open, and will remain open until the Child turns eighteen and is no longer a ward of the State. This order is not a dispositional decree, nor does it modify the dispositional decree already in place. Finally, this order was not entered following a permanency hearing; Child's permanency plan had already been changed to APPLA. Therefore, it seems that this is not a final judgment.

[10] When one takes a step back to look at the effect of this order, however, a different picture emerges. Indiana Code section 31-34-21-7.5 contemplates six different permanency plans for children in a CHINS proceeding:

- Reunification with the child's parent, guardian, or custodian
- Termination of parental rights
- Adoption

- Placement in relative care who is willing and able to act as the child's permanent custodian
- Appointment of a legal guardian
- APPLA

Ind. Code § 31-34-21-7.5(c). Typically, a child whose plan is changed to APPLA is an older, teenaged child who is unlikely or unwilling to be adopted, who has no relatives able or willing to act as a custodian or guardian, and whose parents are unable or unwilling to become safe and appropriate caregivers.

[11] In this case, DCS asked that Child's permanency plan be changed to adoption, with the intention of filing a petition to terminate the parent-child relationship with respect to both of Child's parents. The juvenile court denied that request, instead determining that a plan of APPLA was in Child's best interests. Appellant's App. p. 325. The practical effect of a change of plan to APPLA is that Child will remain a ward of the State until she reaches the age of majority. She will either remain in foster care or live in a facility or group home, and she will continue to receive the treatment and services she needs. Her CHINS case will remain open until she turns eighteen.[1]

---

[1] When Child turns eighteen, she may have the option of participating in the Collaborative Care program, which is designed to continue providing services to children who were in foster care at the age of eighteen to help them transition to adulthood. DCS services will remain in place until the "older youth" reaches the age of twenty, pursuant to the youth's agreement to attend school or maintain employment. Ind. Code § 31-28-5.8-1 *et seq.*

[12] By ordering that all contact between Mother and Child cease, the trial court is effectively ending that relationship until Child is a legal adult, at which time it will be her choice to resume contact with Mother. Child will turn eighteen in July 2016—over two years away from the date on which the juvenile court ordered contact between Child and Mother to cease. Whether or not this is technically a final judgment, it certainly operates as one. Consequently, we will consider Mother's arguments. *See In re Adoption of O.R.*, 16 N.E.3d 965, 970-71 (Ind. 2014) (holding that a party's failure to file a timely notice of appeal does not deprive the appellate courts of jurisdiction to hear the case and emphasizing a strong preference to resolve cases on the merits when possible).

## II. Parenting Time

[13] The sole issue raised by Mother in this case is that the juvenile court erred by ordering that all contact between Mother and Child cease. In considering Mother's argument, we will not set aside the juvenile court's findings or judgment unless clearly erroneous. Ind. Trial Rule 52(A). We will neither reweigh the evidence nor assess witness credibility, and will view the evidence and its reasonable inferences most favorably to the judgment. *In re T.S.*, 906 N.E.2d 801, 804 (Ind. 2009).

[14] While there is no statute specific to the CHINS context related to parenting time, we find the general family law statute on the issue to be instructive:

> The court may modify an order granting or denying parenting time rights whenever modification would serve the best interests of the child. However, the court shall not restrict a parent's parenting time

rights *unless the court finds that the parenting time might endanger the child's physical health or significantly impair the child's emotional development.*

Ind. Code § 31-17-4-2 (emphasis added). In this case, the juvenile court made just such a finding: "The mother has visited the child consistently; however, these visits have proven to be detrimental to the wellbeing of the child due to mother's inappropriate behaviors during the visits." Appellant's App. p. 331. While the juvenile court did not use the precise words of the above statute—which may not even apply directly to a CHINS case—the clear import of the finding is synonymous with the statutory language. The juvenile court ultimately concluded, based on this finding, that cessation of the visits would be in Child's best interests.

[15] The record is replete with evidence supporting the juvenile court's conclusions. Child suffered multiple traumas while placed in Mother's care. Since Child has been out of Mother's care, Mother has behaved inappropriately during visits, inserted herself in between Child and her foster parent in inappropriate ways, refused to participate in services designed to help her become a better parent, and denied that she has done anything inappropriate as a parent. Child's therapist, FCM, and CASA all testified that further contact with Mother is detrimental to Child's well-being and that cessation of contact is in Child's best interest. The visitation supervisor testified that at least half of the visits have been detrimental to Child and that Mother has made no improvement in her parenting abilities in ten months. This evidence readily supports the juvenile

court's order ceasing visitation and phone contact between Mother and Child. We find no error.[2]

[16] The judgment of the juvenile court is affirmed.

May, J., and Barnes, J., concur.

---

[2] Mother argues that ceasing visitation defeats DCS's ability to achieve reunification between parent and child. Inasmuch as the Child's permanency plan has been changed to APPLA, however, reunification is no longer the goal. Ind. Code § 31-34-21-7.5(c)(1)(F).