## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 23 2017, 9:12 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Melanie K. Reichert
Jesse G. Pace
Laura K. Lauth
Broyles Kight & Ricafort, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of S.B. (Minor Child in Need of Services),

J.B. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

June 23, 2017

Court of Appeals Case No. 49A05-1701-JC-166

Appeal from the Marion Superior Court

The Honorable Marilyn A. Moores, Judge

Trial Court Cause No. 49D09-1406-JC-1211

**Najam, Judge.**

## Statement of the Case

J.B. ("Mother") appeals the trial court's order changing her daughter S.B.'s permanency plan from reunification to "another planned permanent living arrangement" ("APPLA"). However, we do not reach the merits of Mother's appeal because she does not appeal from a final judgment. We dismiss.

## Facts and Procedural History

Mother and R.B. ("Father"), who is deceased, were married and had two children together: J.B., born in October 1997; and S.B., born in December 1999 (collectively "the Children").[1] In September 2013, Father, a police officer, was killed in the line of duty. On June 4, 2014, someone contacted DCS to report that Mother was having substantial difficulty taking care of the Children. In particular, a DCS intake officer reported as follows:

> [Mother] has a diagnosis of Bi-polar Disorder, has not had mental health treatment in over a year, is not taking her medication and is spiraling out of control with erratic and sometimes dangerous behavior. It was also reported that [J.B. and S.B.] have had to take care of their mother who often lies in bed 24 hours at a time over[-]medicated and non[-]functioning. [Mother] has told people on several occasions that she wants to take her own life to be with [Father]. On Mother's Day she presented at her husband's grave site with a loaded gun with the

---

[1] The trial court's order from which Mother appeals also pertains to J.B., but Mother's contentions on appeal only concern S.B.

intention of killing herself. She was found to have 5 guns and 50,000 rounds of ammunition stored in her home. Neither [Mother] nor her children have received any therapy or grief counseling to deal with the sudden death of [Father] and [Mother] has forbidden her son from seeking counseling on his own. While [family case manager supervisor ("FCMS")] Sparling was at [Mother's] home to interview her she was asked by the police to put the dogs in the back yard so that they could speak to her. [Mother] then proceeded to lock herself in her home and attempted to use her dogs as a barrier to prevent DCS and law enforcement from entering the home. As a result of [Mother's] erratic concerning behavior she was involuntarily detained and placed on a 72 hour hold at Methodist Hospital for psychiatric observation. FCMS Sparling observed the home to [be] deplorable with piles of laundry on [the children's] beds, laundry and trash piled high and blocking the hallway, the lights in both children's rooms were broken and were not able to be turned on, and the home smelled of dog urine. [Mother] exhibits ho[a]rding behavior and during manic phases is known to order massive quantities of a particular product to be shipped to the home.

Appellant's App. Vol. II at 33. DCS placed the Children with relatives.

[3] On July 28, 2014, Mother and DCS entered into an Admission and Agreement on Services, whereby Mother admitted that each child was a Child in Need of Services ("CHINS"), and she agreed to participate in home-based therapy, authorize DCS to obtain her mental health records, participate in the Children's therapy as recommended by their therapists, and exercise parenting time "as soon as the Court orders parenting time or the team is in agreement that parenting time shall occur." *Id.* at 76. On November 20, the trial court adjudicated each child to be a CHINS and issued a parental participation order,

which included an order that Mother "exercise parenting, upon positive recommendations from DCS, GAL, and all services providers." *Id.* at 99.

[4] During a periodic review hearing on April 23, 2015, the family's service providers stated that visitations between Mother and S.B. were "ongoing," but J.B. had one visit with Mother and "maintain[ed] his position that he not be placed with Mother." *Id.* at 119. Service providers also stated that "Mother's focus continue[d] to be control, rather than what she[ was] willing to do to improve her relationship with [the] children," and the Children's therapist reported that "Mother has utilized guilt and pressure to try to force [S.B.] to come back in to her home." *Id.* Finally, DCS reported that, on April 1, the Children were removed from one relative's care and placed in another relative's care, but the first relative expressed a "willingness to have the children placed back in her care so long as Mother's threatening behaviors and comments cease[d]."[2] *Id.*

[5] On May 21, Mother underwent a psychological evaluation with a psychometrist and a psychologist, and she was diagnosed as having posttraumatic stress disorder ("PTSD"), depression, and anxiety. Accordingly, the evaluators recommended that Mother: "consult with a psychiatrist regularly to manage her medications"; "continue to participate in Individual

---

[2] That caregiver reported that Mother had sent a "series of text messages . . . to a family friend speaking very negatively about the caregivers at that time. [She] reported being fed up with all the negativity and stress that [Mother] was bringing into their household." Appellant's App. Vol. II at 197.

Therapy Services"; "continue to participate in family therapy to increase positive, effective interactions between family members and to help define familial roles"; and put in place a safety plan for the Children, including "a list of adults they can contact to gain help in an emergency or if [Mother] is experiencing debilitating medical issues or suicidal ideation." *Id.* at 135.

[6] In a memorandum to the court submitted on October 26, DCS reported that, "[d]uring monthly visits to the home between August and October," S.B. informed the FCM "that she does not wish to return home." *Id.* at 150. S.B. indicated that she did not want to be adopted, but that she would like to have relatives appointed to be her guardians. Following a permanency hearing on November 17, the court noted that S.B. "does not want to visit with her mother at this time[.]" *Id.* at 158. S.B. also requested "to discontinue family therapy in regard to mother." *Id.* at 159. S.B. reported to a service provider "that she thought that if her mother cannot behave well with all of these people watching her, how would she act if no one were watching. [S.B.] was very upset with her mother for not bringing . . . documents to the BMV[ to obtain her driver's permit]."[3] *Id.* J.B. and S.B.'s homebased therapist reported that the Children

---

[3] A relative told the court that Mother had

> told [S.B.] that she would not be allowed to get her [driver's] permit because she had brought relative care [to the BMV]. Mother began to curse and bec[a]me belligerent in the parking lot at the BMV and then began to wave the documents in front of [S.B.] and stated she didn't have to give them to her.

Appellant's App. Vol. II at 159.

"are vocal about their mother and not having a safe family home. Children have described a toxic environment with mother." *Id.* That therapist also stated that "the children are not being unreasonable with their expectations of their mother and notes that [S.B.] did attempt to reunify with her mother and stated she wanted a relationship with her mother, however, mother has continued to not follow through with promises made to the children." *Id.*

[7] Nearly one year later, on October 6, 2016, the trial court held a permanency hearing and heard testimony from various service providers. The Guardian ad Litem recommended to the trial court that the permanency plan for S.B. be changed from reunification to APPLA. At the conclusion of the permanency hearing, the trial court stated as follows:

> Mother has demonstrated through this case a very strong sense of parenthood which is positive, but the parenthood is in the sense of ownership not necessarily in parenthood in the sense of nurturing in providing what the child needs, but that I should have respect because I'm the parent and respect by kids once they get this old is earned and I think the Court has—and the, the Court has seen more than reasonable efforts by the Department of Child Services to effectuate reunification. The Court already declined to change the plan for [S.B.] previously because the Court believed that additional services were necessary and another attempt should be made, but it's pretty clear that a good faith and earnest effort at family therapy has been attempted in this case and that Mother is either unable or unwilling, and I don't know which it is, to make the necessary changes to validate the trauma that her child has experienced and as a result I'm going to find that it is in the child's best interest for the plan to change to another planned permanency living arrangement. Now I want the individual therapy to continue and given that the

plan has changed I think it would still be a good idea because now the, the - for lack of a better word the power differential or the physical location of [S.B.] is not going to be the battleground. I think that they can work on upon [sic] positive recommendations of Mother's therapist and of [S.B.]'s therapist to again attempt family therapy because those services can remain open, but as long as the battleground is you're my child, you need to be in my home and do what I say exists I don't see progress being made in the two and a half years that this case has, has been pending. So, I think that means that we need to arrange trust accounts for both of the children[,] Mr. Hollowell[,] so you'll need to arrange that and I am going to order that the individual therapy services continue and that at an appropriate time that the discussion of family therapy be again discussed and implemented. You don't need an authorization from me. You guys have the better guidance for this than I do. So, I will set this out for a review hearing in ninety days.

*Id.* at 26-27. And the trial court issued a written order with findings and conclusions supporting the APPLA placement for S.B. This appeal ensued.

# Discussion and Decision

[8] The State contends, and we agree, that we should dismiss this appeal because Mother has not appealed from a final judgment. The APPLA order is a permanency order, which this court has held is not a final judgment. *See T.W. v. Ind. Dep't of Child Servs. (In re D.W.)*, 52 N.E.3d 839, 841 (Ind. Ct. App. 2016), *trans. denied*. In particular, in *In re D.W.*, we held as follows:

> This court's authority to exercise appellate jurisdiction is generally limited to appeals from final judgments, certain interlocutory orders, and agency decisions. *In re K.F.*, 797 N.E.2d 310, 314 (Ind. Ct. App. 2003); Ind. Appellate Rule 5.

Mother makes no argument that the trial court's order qualifies as an appealable interlocutory order pursuant to Indiana Appellate Rule 14 or that this is an agency decision. Rather, Mother argues that the trial court's order was a final judgment.

Under Indiana Appellate Rule 2(H),

A judgment is a final judgment if:

> (1) it disposes of all claims as to all parties;
>
> (2) the trial court in writing expressly determines under Trial Rule 54(B) or Trial Rule 56(C) that there is no just reason for delay and in writing expressly directs the entry of judgment (i) under Trial Rule 54(B) as to fewer than all the claims or parties, or (ii) under Trial Rule 56(C) as to fewer than all the issues, claims or parties;
>
> (3) it is deemed final under Trial Rule 60(C);
>
> (4) it is a ruling on either a mandatory or permissive Motion to Correct Error which was timely filed under Trial Rule 59 or Criminal Rule 16; or
>
> (5) it is otherwise deemed final by law.

The trial court's order, however, does not meet any of these qualifications. In fact, we have held under similar circumstances that such orders are not final appealable judgments. *See In re K.F.*, 797 N.E.2d 310, 314-15 (Ind. Ct. App. 2003) (holding that a permanency plan in a CHINS action is not a final judgment).

*Id.* at 841. Likewise, here, Mother purports to appeal from a final judgment.

But the order does not dispose of all claims as to all parties, as the trial court

scheduled a placement review hearing for January 19, 2017. Thus, Mother's appeal is not an appeal from a final judgment or final, appealable order.

[9] Still, citing *J.W. v. Indiana Department of Child Services (In re E.W.)*, 26 N.E.3d 1006 (Ind. Ct. App. 2015), Mother contends that we have jurisdiction to consider her appeal. In particular, Mother maintains that the APPLA order "effectively terminated" her parental rights. Appellant's Br. at 9. We cannot agree.

[10] In *In re E.W.*, the trial court had previously placed then-fifteen-year-old E.W. in APPLA, and E.W.'s mother did not appeal that order. The trial court subsequently ordered that E.W.'s mother have no contact with E.W., and the mother appealed. In addressing, *sua sponte*, whether mother was appealing from a final judgment, we held in relevant part that,

> [b]y ordering that all contact between Mother and Child cease, the trial court is effectively ending that relationship until Child is a legal adult, at which time it will be her choice to resume contact with Mother. . . . *Whether or not this is technically a final judgment, it certainly operates as one*.

*Id.* at 1009 (emphasis added).

[11] The instant case is distinguishable from *In re E.W.* First, unlike in *In re E.W.*, here Mother appeals only the trial court's APPLA order following a permanency hearing, and this court has held that such an order is not a final judgment. *See In re D.W.*, 52 N.E.3d at 841. Second, the trial court has not ordered that contact between Mother and S.B. cease. To the contrary, the

court's order "authorizes family therapy upon positive recommendations from mother's therapist and [S.B.]'s therapist." Appellant's App. Vol. II at 26. In other words, under the terms of the order, Mother will continue to have opportunities to be a parent to S.B. Unlike the order in *In re E.W.*, the order in the instant appeal is not a final judgment and does not operate as one. Accordingly, we dismiss this appeal.

[12] Dismissed.

Riley, J., and Bradford, J., concur.